**STATE of Missouri, Respondent,**

v.

**Gregory Lee RULON, Appellant.**

No. 69110.

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 29, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 17, 1996.

Application to Transfer Denied
Jan. 21, 1997.

Frank K. Carlson, Carlson & Hellmann, Union, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David R. Truman, Asst. Atty. Gen., Jefferson City, for respondent.

GERALD M. SMITH, Judge.

Defendant appeals from judgments of conviction of murder second degree and armed criminal action based on a jury verdict. The jury recommended punishment of ten years imprisonment on the murder charge and three years on the armed criminal action charge which the trial court imposed to run concurrently. We affirm.

No question is raised of the sufficiency of the evidence. Defendant and the victim, Kelly Lafferty, were business partners and homosexual lovers. Beginning in 1992 they lived together in a house owned by defendant. Defendant adduced considerable evidence that Lafferty in 1993 began to drink excessively and to physically abuse defendant. There was evidence by the State that such abuse did not occur. There was evidence that by the date of the shooting defen-

dant and Lafferty had agreed to sever both their personal and business relationships. Defendant testified that on the evening of October 23, 1994, Lafferty was to move out of the house. During that evening Lafferty became angry, physically abused defendant and threatened to kill him. Lafferty left the premises and then returned, kicked in the door and entered the house. Defendant testified that his glasses had been broken in the prior physical abuse and he could not see whether Lafferty had a weapon, but believed he did. He contended that he shot Lafferty in self-defense as Lafferty came toward him.

The State presented evidence that five shots were fired, four of them striking Lafferty. Two of the shots struck Lafferty in the back, one struck him in the chin, and one struck his arm. Two of the shots were fatal. It was the State's contention, for which there was evidence to support an inference, that Lafferty was shot in the back as he was leaving the premises and turned toward defendant after being struck by at least two bullets in the back.

■ Defendant first contends that the trial court restricted his opportunity on voir dire to examine into the venirepersons' attitudes, prejudices, and biases about homosexuality and homosexuals. The record reveals that the defendant was considerably less restricted in the voir dire examination in this area than he contends in his brief.

Defendant's initial question to the panel on this subject was: "Many people believe that homosexuality is against God's law. I want to know how many people share that view?" That question resulted in a large number of panel members raising their hands. Counsel then confirmed that belief by asking each of the panel members indicating an affirmative response to the question if that was their view. The court then held a conference at the bench and asked what questions counsel was going to ask next. Counsel's response was: "Next question? How and by whom." We are not clear what that response meant. Following some discussion the trial court stated that it would allow counsel one well-selected question to develop cause strikes. Counsel then indicated that he would attempt to frame one or two carefully chosen ques-

tions. A recess was taken at that point to allow counsel time to frame the questions. A further colloquy ensued during the recess during which the court indicated its willingness to question the jury in this area. Counsel for defendant requested that he be allowed to ask the panel limited questions in this area.

Following the recess defendant's counsel made the following statement and question:

Thirty-five of you responded to my last question. That's more than half of you remaining after some people have already left this panel. And I'm sure it's obvious that everyone causes me great concern and I need to ask you this: Any of you who— are there any of you who believe that homosexuality is against God's law who would be able to follow man's law instead, in this courtroom, and leave God's will up to God?

At that point the court advised that it would rephrase the question and put it in a way "that requires you to raise your hand." The court then posed the question "Of those of you who responded to Mr. Carlson's earlier question, are any of you not able to understand the distinction between God's law and man's law and are any of you not able to follow man's law with respect to that particular issue in this case?" After several people raised their hands the trial court stated it would get back to them but wished to rephrase the question again to clarify it. The court then made the following statement and question:

You've been instructed previously about your obligation to follow the law. Now, I'm going to tell you that the law with respect to this case, that you're going to be given in the instruction, is the law of the State of Missouri. Are any of you going to apply God's law, as you understand it, above, in this particular case, the law of the State of Missouri as it will be given to you in the instructions?

Further questioning of the panel members giving affirmative responses was directed to the panel members' ability to follow the law as given in the instructions and that they understood the issue to be decided was whether defendant was guilty of murdering Lafferty. The venire was also asked if any of them would be prejudiced against the defendant or the State because of evidence of a homosexual relationship between defendant and Lafferty. Several of the venire answered affirmatively and were subsequently stricken for cause. Defense counsel also asked the panel if any of them would give any different weight to defendant's testimony because he is gay and whether any panel members felt homosexuality inclines a person more or less toward violence. Venire persons who answered affirmatively that homosexuality inclines a person more toward violence were subsequently stricken for cause. Counsel then asked if any of the panel knew or associated with gay people. At that point the trial court ruled that the area had been explored and further exploration would be counterproductive.

■ The control of voir dire is a matter within the discretion of the trial court, and will not be disturbed in the absence of abuse of that discretion. *State v. Ramsey*, 864 S.W.2d 320 (Mo.banc 1993)[39,40]. The trial court supervises the examination of the qualifications of jurors and exercises its discretion over the nature and extent of the questions counsel may ask. *State v. Skelton*, 851 S.W.2d 33 (Mo.App.1993)[2–6].

Defendant contends that further voir dire was constitutionally mandated citing *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). *Ham* involved a black defendant charged with a drug offense. His defense was that the law enforcement officers framed him in retaliation for his active, and widely known, participation in civil rights activities. The Supreme Court held that the Fourteenth Amendment required the judge in that case to interrogate the panel on the subject of racial prejudice. *Id.* at 527, 93 S.Ct. at 850 [1,2]. This was because his reputation as a civil rights activist and his defense were likely to intensify any prejudice that individual members of the jury might harbor. *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017[1–3], 47 L.Ed.2d 258 (1976). The Constitution does not, however, always entitle a defendant to have questions posed during voir dire specifically directed to matters

that conceivably might prejudice venirepersons against him. *Id.*

 Racial issues, and presumably other issues of potential prejudice by analogy, must be inextricably bound up with the conduct of the trial in order to trigger a Constitutional right to voir dire on the subject. *Id.* The fact that the defendant in *Ristaino* was black and the victim was white did not give rise to a voir dire examination probing racial prejudice.

If we assume that the *Ham* requirements apply to prejudice against homosexuals, there is nothing indicating that issue was inextricably bound up with the conduct of the trial. There was no contention that defendant was being framed or prosecuted because he was homosexual. There was no contention that either his actions or that of the victim were grounded in homosexuality or occurred because either was homosexual. The evidence was that defendant killed Lafferty and the issue was whether that killing was done in self-defense. The issue before the jury was one which is commonly found in murder cases and has no underlying racial, ethnic, or sexual preference base. The venire panel was examined at some length on whether defendant's sexual preference would affect the ability of the venire persons to properly weigh the evidence and render a verdict. Those who indicated it would were excused for cause. The court was quite generous in excusing for cause any venireperson that indicated an inability to be fair because of defendant's sexual preference. The inquiries made to the venire panel were far more extensive than the questions sought to be asked in *Ham*. We find no error or abuse of discretion in the court's handling of voir dire.

Defendant raises two other points of trial error. We find neither to have merit. An extended discussion of them would have no precedential value and we affirm as to them pursuant to Rule 30.25(b).

Judgment affirmed.

CRANE, P.J., and KAROHL, J., concur.